FILED
United States Court of Appeals
Tenth Circuit

January 18, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JANNA DEWITT,

      Plaintiff-Appellant,

v.

SOUTHWESTERN BELL
TELEPHONE COMPANY,

      Defendant-Appellee.

No. 14-3192

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:12-CV-02605-SAC)**

---

Ryan K. Elliot, Disability Rights Center of Kansas, Topeka, Kansas (Amy L. Coopman, Foland, Wickens, Eisfelder, Roper & Hofer, P.C., Kansas City, Missouri, with him on the briefs), for Plaintiff-Appellant.

Michael L. Matula, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Kansas City, Missouri (Adam T. Pankratz, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Kansas City, Missouri, with him on the brief), for Defendant-Appellee.

---

Before **KELLY**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

    Janna DeWitt appeals from the district court's order granting summary

judgment to her former employer, Southwestern Bell Telephone Company

("SWBTC"), on her claims of disability discrimination and failure to

accommodate her disability in violation of the Americans with Disabilities Act

("ADA"), *as amended by* ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No.

110–325, 122 Stat. 3553,[1] 42 U.S.C. § 12101 *et seq.*, and retaliation in violation of

---

[1]     The ADAAA's amendments to the ADA went into effect on January 1, 2009.  ADAAA § 8, 122 Stat. at 3559.  The events that form the basis for Ms. DeWitt's disability-related claims occurred after this date; therefore, the ADAAA is technically applicable here.  In recognition of this fact, we refer to her disability-related claims herein as claims alleging violations of the ADAAA.  *See Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016) (referring to the ADAAA as "the governing version of the ADA" and analyzing the plaintiff's claims under the ADAAA's rubric); *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 879 n. 1(10th Cir. 2015) (adopting this approach and specifically acknowledging "the premise that [the plaintiff's] lawsuit proceeds under the ADAAA").  However, the ADAAA primarily effected revisions to the ADA's definition of "disability."  *See Adair*, 823 F.3d at 1304 ("outlin[ing] the relevant substantive changes that Congress made to the ADA by enacting the ADAAA"); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1144 (10th Cir. 2011) ("Congress amended the ADA in 2008 'to correct what it viewed as an overly restrictive interpretation of the statute's terms [i.e., regarding the meaning of "disability"] that had been adopted by the Supreme Court . . . .'" (quoting *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 855 (5th Cir.2010))); *accord Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 188 (3d Cir. 2009) ("The ADAAA amends the ADA in important respects, particularly with regard to the definition and construction of 'disability' under the statute."); *see also Latham v. Bd. Educ. of Albuquerque Pub. Schs.*, 489 F. App'x 239, 244 (10th Cir. 2012) ("Generally speaking, the ADAAA was intended to remove certain constraints on the definition of 'disability' imposed by the [Supreme] Court's construction of the ADA.") (collecting cases).  Those revisions are not material to the disability issues that Ms. DeWitt has presented for our resolution. *See Adair*, 823 F.3d at 1307–08 ("Congress's 2008 amendments to the ADA did not fundamentally change the qualification requirement." (quoting *Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013))); *Hawkins*, 778 F.3d at 879 n.1 (though acknowledging that the plaintiff's "lawsuit proceeds under the ADAAA," electing to "apply the standards of the ADA" where the plaintiff's "disability *vel non* is not disputed").  Therefore, though we refer to Ms. DeWitt's disability-related claims as alleging violations of the ADAAA—in recognition of the time period during which they accrued—we freely rely on authorities prior to ADAAA's effective date that apply and construe the ADA, insofar as they are relevant.  *See Hawkins*, 778 F.3d at 879 n.1.

the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.[2]

## I[3]

### A

SWBTC is a telephone service company with a customer-service call center in Wichita, Kansas. Ms. DeWitt began working at SWBTC's Wichita call center as a customer service representative in April 1997. In this role, Ms. DeWitt answered calls from customers requesting residential service from SWBTC.

Ms. DeWitt has Type I diabetes and is insulin dependent. Ms. DeWitt monitors her blood sugar levels numerous times per day. When Ms. DeWitt's blood sugar levels are relatively low, she may experience sweating, shakiness, fatigue, lethargy, confusion, and poor coordination. Ms. DeWitt told her managers at SWBTC that she had diabetes and that she may experience low blood sugar levels and need to eat or drink something to correct them. Throughout her employment at SWBTC, the company allowed Ms. DeWitt to take breaks to eat or drink to raise her blood sugar as needed.

---

[2]     In light of this disposition, we **deny as moot** SWBTC's motion to strike.

[3]     On appeal from a ruling granting summary judgment, "[w]e view the facts, and all reasonable inferences those facts support, in the light most favorable to the nonmoving party." *Hawkins*, 778 F.3d at 882 (alteration in original) (quoting *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011)), *cert. denied*, 136 S. Ct. 690 (2015). We recite the following facts accordingly.

3

In 2009 and early 2010, Ms. DeWitt used FMLA leave intermittently for health issues related to her diabetes. Ms. DeWitt only took FMLA leave when vacation days were not available because Ms. DeWitt believed that SWBTC "frowned upon" employees taking FMLA leave. Aplt.'s App. at 434 (DeWitt Dep., dated May 3, 2013). Suzanne Garcia, a former manager at SWBTC, stated that when a customer service representative used "FMLA leave[, it] negatively impacted the sales quotas of the sales manager." *Id.* at 440 (Garcia Decl., dated July 7, 2014). As a result, "[s]ome employees using FMLA leave were targeted as employees that [SWBTC] wanted to terminate" and SWBTC "looked for other reasons to terminate that employee." *Id.* Moreover, Ms. Garcia stated that "Ms. DeWitt was on the 'target list' as an employee who used FMLA leave and should be fired if possible for other reasons." *Id.* at 441. Ms. Garcia left SWBTC in 2008. *Id.* at 440.

Ms. Garcia specifically identified Beth Kloxin as one of the SWBTC managers that "discussed terminating employees using FMLA leave." *Id.* at 441. Ms. Kloxin was the Center Support Manager charged with "do[ing] the attendance, disabilities," and also "preparing . . . separation proposals." *Id.* at 87 (Kloxin Dep., dated Aug. 23, 2013). Employees called Ms. Kloxin if they were going to be absent or if they wanted to request FMLA leave.

On January 21, 2010, Ms. DeWitt mistakenly left phone service on a customer's account after the customer cancelled the service. Known as a

4

cramming violation, the failure to remove a service plan from a customer's account after the customer cancels the service is a violation of the SWBTC Code of Business Conduct and a terminable offense. Ms. DeWitt was suspended the following day. On January 29, 2010, Ms. DeWitt attended a "Day in Court" to address the cramming incident and determine her punishment. As punishment for the cramming violation, Ms. DeWitt's Second Line Supervisor, Henry Rivera, in consultation with Ms. DeWitt's Third Line Supervisor, Kimberly Baskett-McEnany, decided to place Ms. DeWitt on a Last Chance Agreement. The Last Chance Agreement stated that "even one incident of failing to maintain satisfactory performance in all components of [her] job, including . . . company policies[] and conduct may lead to further disciplinary action up to and including dismissal." *Id.* at 39 (Last Chance Agreement, filed Sept. 13, 2012).

On March 3, 2010, two months after the cramming incident, Ms. DeWitt suffered a severe drop in blood sugar while at work. She was unable to stabilize her blood sugar even after eating food and drinking juice. As a result, Ms. DeWitt experienced lethargy, disorientation, and confusion, and was "unable to communicate with anyone." *Id.* at 14–15, 26–27. Ms. DeWitt noticed that she was locked out of her computer and called her First Line Supervisor, Tom Heumann, for assistance. Mr. Heumann did not address her computer issues, and instead informed Ms. Kloxin that he had been monitoring Ms. DeWitt's calls and that she had hung up on at least two customers. Ms. Kloxin responded by "doing

a dance" and saying, "I finally got that bitch." *Id.* at 458 (Rivera Dep., dated Oct. 1, 2013). Mr. Rivera told Ms. Kloxin that her behavior was "not appropriate." *Id.* Ms. Kloxin responded, "You don't understand. I've been chasing after her long before, since you got here." *Id.*

Later that day, Mr. Heumann and Ms. Kloxin conducted a suspension meeting with Ms. DeWitt regarding the two calls she had dropped earlier in the day. Maddie Tormey, a union steward, also attended the meeting. Ms. DeWitt told Mr. Heumann that she did not remember taking the dropped calls and that "she had been experiencing dangerously low blood sugar levels at the time of the calls." *Id.* at 15. After reviewing recordings of the dropped calls, Ms. DeWitt said that she "honestly [did not] remember the customer saying hello" and asked "Are you sure this is me?" *Id.* at 329. Mr. Heumann informed Ms. DeWitt that she was suspended and that a Day in Court regarding this matter would be held at a later date. At the request of Ms. Kloxin and Ms. Tormey, Ms. DeWitt provided her blood sugar levels for that afternoon.

On March 10, 2010, SWBTC conducted a Day in Court regarding the dropped calls and Ms. DeWitt's employment status. Mr. Rivera, Ms. Kloxin, and Ms. DeWitt attended the meeting, and Ms. Baskett-McEnany attended via conference call. Ms. Baskett-McEnany explained that "[t]his is a time for [Ms. DeWitt] to talk about the" dropped calls and "tell [Ms. Baskett-McEnany] anything about what [happened that Ms. DeWitt] want[ed] [Ms. Baskett-

6

McEnany] to know in regards to making a decision regarding [her] employment." *Id.* at 326. Ms. DeWitt explained that she did not remember taking the calls due to a severe drop in her blood sugar. On March 15, 2010, SWBTC terminated Ms. DeWitt for hanging up on two customers in violation of both the SWBTC Code of Business Conduct and her Last Chance Agreement.

**B**

In September 2012—after timely filing discrimination charges with the Equal Employment Opportunity Commission and receiving her notice of right to sue—Ms. DeWitt filed a lawsuit in the United States District Court for the District of Kansas, bringing claims of unlawful discrimination, failure to accommodate her disability, and retaliation against SWBTC. Specifically, Ms. DeWitt alleged that SWBTC (1) discriminated against her in violation of the ADAAA by terminating her employment because of her disability, (2) failed to accommodate her disability in violation of the ADAAA, and (3) retaliated against her for taking FMLA leave in violation of the FMLA.

The district court granted summary judgment to SWBTC. In regard to her ADAAA termination and FMLA retaliation claims, the district court determined that Ms. DeWitt "fail[ed] to raise any inference of a pretextual termination decision." *Id.* at 553 (Mem. and Order, dated Aug. 13, 2014); *see id.* at 561. As to her failure-to-accommodate claim, the court determined that it, too, failed as a matter of law because the ADAAA does not require an employer to make Ms.

7

DeWitt's suggested accommodation—that is, "to excuse or overlook her misconduct or reduce her discipline, since her conduct was related to her disability." *Id.* at 555.

This timely appeal followed.

**II**

Ms. DeWitt's workplace discrimination and retaliation claims were dismissed on summary judgment. "We review summary judgment determinations de novo, applying the same standard as the district court." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). At this stage of the litigation, we "view facts in the light most favorable to . . . the non-moving party and 'draw all reasonable inferences' in [her] favor." *Id.* (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)). Even so, the non-movant, Ms. DeWitt in this case, must "marshal[] sufficient evidence" requiring submission to the jury "to avoid summary judgment." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1281 (10th Cir. 2015).

"Generally, summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hawkins*, 778 F.3d at 882 (quoting Fed. R. Civ. P. 56(a)). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational

8

jury could find in favor of the nonmoving party on the evidence presented."

*Smothers*, 740 F.3d at 538 (quoting *Tabor*, 703 F.3d at 1215).

**III**

Ms. DeWitt raises three employment-related claims on appeal, each of
which relies on circumstantial evidence: (1) an ADAAA discrimination claim, (2)
an ADAAA accommodation claim, and (3) an FMLA retaliation claim. "This
circuit analyzes employment-related claims based on circumstantial evidence
under the 'analytical framework first articulated in *McDonnell-Douglas* [*Corp. v.
Green*, 411 U.S. 792 (1973)].'" *Smothers*, 740 F.3d at 538 (alteration in original)
(quoting *Johnson v. Weld Cty.*, 594 F.3d 1202, 1217 (10th Cir. 2010)). The
parties' briefing reflects their agreement that this framework applies here. Under
the *McDonnell Douglas* burden-shifting framework, we engage in a three step
analysis:

> (1) First, "the plaintiff must establish a prima facie case of
> discrimination or retaliation," *id.*;
>
> (2) If the plaintiff satisfies this initial burden, "the defendant
> employer must offer a legitimate non-discriminatory reason for
> the adverse employment action," *id.*; and
>
> (3) The burden then shifts back to the plaintiff who "must show
> there is at least a genuine issue of material fact as to whether the
> employer's proffered legitimate reason is genuine or pretextual,"
> *id.*

Under the final step, "[t]o support an inference of pretext, . . . a
plaintiff . . . . must come forward with evidence that the employer didn't really

9

believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Johnson*, 594 F.3d at 1211. When reviewing a plaintiff's "contention of pretext, we examine the facts 'as they appear to the person making the decision to terminate [the] plaintiff.'" *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001) (alteration in original) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)). "We may not second guess the business judgment of the employer." *Id.*

"Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)). "[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Id.* (alterations in original) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)).

Evidence of pretext "may take a variety of forms." *Kendrick*, 220 F.3d at 1230 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187–88 (1989)). Typically, a plaintiff may show pretext in one of three ways:

> (1) with evidence that the defendant's stated reason for the

10

adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that . . . . [the plaintiff] was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

*Id.* (citations omitted).

Regardless of which theory of pretext the plaintiff asserts, "our role isn't to ask whether the employer's decision was 'wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs.'" *Johnson*, 594 F.3d at 1211 (alterations in original) (quoting *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)). "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 948 (10th Cir. 2011) (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007)). "[O]ur role is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); *cf. Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (same), *abrogated in part on other grounds by Eisenhour v.*

11

*Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir. 2014). The determinative question is whether "a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (quoting *Swackhammer*, 493 F.3d at 1167).

**IV**

Ms. DeWitt first contends that the district court erred in granting summary judgment in favor of SWBTC on her ADAAA termination claim. According to Ms. DeWitt, SWBTC terminated her because of her disability in violation of the ADAAA. Because we agree with the district court that SWBTC was entitled to judgment as a matter of law on this claim, we affirm.

**A**

The ADAAA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). To make out a prima facie case for discrimination under the ADAAA, Ms. DeWitt must show that she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037–38 (10th Cir. 2011) (quoting *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1086 (10th Cir. 2008)). "In order to

12

demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an 'adverse employment action because of the disability.'" *Id.* at 1038 (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)).

"If plaintiff establishes a prima facie case," under the *McDonnell Douglas* framework, "the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003) (citation omitted). We now apply this rubric to Ms. DeWitt's ADAAA termination claim.

**B**

We conclude that Ms. DeWitt's ADAAA termination claim fails as a matter of law. In reaching this conclusion, we assume without deciding that Ms. DeWitt has established the prima facie case for her ADAAA termination claim. And SWBTC has easily satisfied its burden under the second prong of the *McDonnell Douglas* framework—that is, SWBTC has articulated a nondiscriminatory reason for terminating Ms. DeWitt's employment—by pointing to evidence that Ms. DeWitt hung up on at least two customers while subject to a Last Chance Agreement. Specifically, Ms. Baskett-McEnany testified to her belief that Ms. DeWitt intentionally dropped the calls; consequently, she decided to terminate

13

Ms. DeWitt's employment. Therefore, Ms. DeWitt's claim must stand or fall on her argument that the dropped calls were merely a pretextual reason for SWBTC to terminate her employment. Ms. DeWitt's claim fails because she has not carried her burden on summary judgment as to the pretext component of the *McDonnell Douglas* framework—that is, Ms. DeWitt identifies no evidence from which a reasonable jury could rationally find that her disability, not the dropped calls, motivated her termination.

## 1

Ms. DeWitt focuses her pretext argument on discrediting Ms. Baskett-McEnany's belief that Ms. DeWitt intentionally hung up on at least two customers, but fails to identify any evidence that casts doubt on this belief.

At the outset, Ms. Baskett-McEnany's belief has an objective basis in the record. Following the January 2010 cramming incident, Ms. Baskett-McEnany and Mr. Rivera decided to put Ms. DeWitt on a Last Chance Agreement. The Last Chance Agreement authorized SWBTC to terminate Ms. DeWitt's employment if she violated the Code of Business Conduct. Only about two months later, in March 2010, Ms. DeWitt hung up on at least two customers, thereby violating the Code of Business Conduct's requirement that customer service representatives treat customers "in a professional, courteous manner." Aplt.'s App. at 252 (AT&T's Code of Business Conduct, filed Apr. 29, 2014). Aware of the Last Chance Agreement, Ms. Baskett-McEnany conducted a Day in

14

Court so that Ms. DeWitt could share her side of the story, and thereafter concluded that Ms. DeWitt had dropped the calls intentionally. Based on this conclusion, Ms. Baskett-McEnany, in consultation with Mr. Rivera, decided to terminate Ms. DeWitt's employment.

In reaching her conclusion that Ms. DeWitt intentionally dropped the calls, Ms. Baskett-McEnany considered multiple factors. First, she considered how "difficult [it is] to accidentally hang up on a customer." *Id.* at 300. Terminating a phone call is a two-step process, she testified, requiring two separate clicks of the mouse; that is, hanging up on customers required "discrete decisions to do that." *Id.* Second, Ms. Baskett-McEnany considered that Ms. DeWitt operated successfully the rest of the day and never reported that she was not feeling well. She also interacted with a co-worker on an instant messaging system immediately prior to the first dropped call. Third, Ms. DeWitt did not go into auxiliary mode or take a break from accepting calls, which she was permitted to do if she became ill. Fourth, Ms. DeWitt was in close proximity to other customer service representatives when the dropped calls occurred yet Ms. DeWitt identified no witnesses that would have observed her disorientation. Fifth and finally, Ms. Baskett-McEnany considered that although she believed Ms. DeWitt to be an honest person, Ms. DeWitt's Last Chance status put her job in jeopardy and could have motivated her to invent a disability-related cause for her misconduct. Ms. Baskett-McEnany weighed these facts against Ms. DeWitt's claim that her

15

disability caused her to drop the calls, and developed the belief that Ms. DeWitt intentionally dropped the calls. Accordingly, Ms. Baskett-McEnany, in consultation with Mr. Rivera, decided to terminate Ms. DeWitt's employment.

Ms. DeWitt now complains that this detailed rationale was mere pretext for discrimination, but points to no evidence that belies Ms. Baskett-McEnany's belief that Ms. DeWitt intentionally hung up on customers or that contradicts Ms. Baskett-McEnany's and Mr. Rivera's proffered, non-discriminatory reason for terminating Ms. DeWitt. In other words, Ms. DeWitt supports her pretext complaint with "[m]ere conjecture." *Morgan*, 108 F.3d at 1323. Moreover, it bears underscoring that, even though the strong factual foundation for Ms. Baskett-McEnany's belief works to severely undercut Ms. DeWitt's pretext argument, it ultimately is immaterial whether Ms. Baskett-McEnany's belief was actually correct— *viz.*, her belief that Ms. DeWitt's hang-ups were intentional; what matters is that Ms. Baskett-McEnany "honestly" held that belief and "acted [on it] in good faith." *Johnson*, 594 F.3d at 1211. Accordingly, Ms. DeWitt's ADAAA termination claim must fail.

**a**

Ms. DeWitt first attempts to show pretext by pointing to evidence of the subjective beliefs of individuals who played no role in the decision to terminate Ms. DeWitt's employment. None of this evidence, however, bears on the

16

credibility of Ms. Baskett-McEnany's stated reasons for terminating Ms. DeWitt's employment; therefore, it fails to show pretext.

For instance, Ms. DeWitt points to evidence of her own belief that symptoms related to her diabetes caused her to disconnect the phone calls. But Ms. DeWitt's opinion on this matter has no bearing on whether Ms. Baskett-McEnany honestly believed that Ms. DeWitt dropped the customer calls intentionally. Ms. DeWitt goes further, arguing that the conflict between her view and Ms. Baskett-McEnany's raises a jury question as to why Ms. DeWitt disconnected the customer calls. Ms. DeWitt's argument misapprehends our inquiry here: our inquiry is not *why* Ms. DeWitt disconnected the customer calls. Nor is it whether Ms. Baskett-McEnany's view that Ms. DeWitt intentionally hung up on customers "was wise, fair or correct." *Id.* (quoting *Rivera*, 365 F.3d at 925). Our inquiry under *McDonnell Douglas* is limited to whether Ms. Baskett-McEnany honestly believed her stated reason for terminating Ms. DeWitt's employment and acted in good faith on that belief.

Ms. DeWitt again misses the mark when she points to evidence of Ms. Kloxin's animus to show pretext. Ms. Kloxin's animus for Ms. DeWitt is undisputed. Ms. Kloxin responded to knowledge of Ms. DeWitt's dropped calls by "doing a dance" and stating, "I finally got that bitch." Aplt.'s App at 458. And when Mr. Rivera told Ms. Kloxin that her behavior was inappropriate, she responded, "You don't understand. I've been chasing after her long before, since

17

you got here." *Id.* But Ms. Kloxin's subjective beliefs are irrelevant because she was not a decision-maker here; Ms. Baskett-McEnany made the decision to terminate Ms. DeWitt's employment, in consultation with Mr. Rivera.

Ms. DeWitt makes no claim that Ms. Kloxin's animus influenced Ms. Baskett-McEnany's termination decision (or for that matter Mr. Rivera's advice to her). Ms. DeWitt notes that Ms. Kloxin was "the manager responsible for keeping track of employees' medical and disability leave" and "for drafting the termination paperwork for [Ms.] DeWitt." Aplt.'s Opening Br. at 36. But Ms. DeWitt does not explain how Ms. Kloxin's accounting and drafting responsibilities influenced Ms. Baskett-McEnany's decision. Moreover, there is no evidence that Ms. Baskett-McEnany even knew of Ms. Kloxin's animus. (Furthermore, the record affirmatively shows that her advisor, Mr. Rivera, disapproved of Ms. Kloxin's display of animus toward Ms. DeWitt in the workplace.) In sum, Ms. DeWitt fails to show how evidence of Ms. Kloxin's animus undermines SWBTC's stated reason for terminating Ms. DeWitt's employment.

**b**

In contravention of Tenth Circuit precedent, Ms. DeWitt requests that we decline to apply the honest-belief doctrine. She argues that the honest-belief doctrine eviscerates the third prong of the *McDonnell Douglas* framework (i.e., the pretext prong) by "short circuit[ing] [a plaintiff's] ability to show that [its

18

employer's] actions were motived by or resulted in illegal discrimination." *Id.* at 26. It goes without saying that we are not situated to deviate from our settled precedent that has adopted the honest-belief rule. *See, e.g.*, *Medley v. Polk Co.*, 260 F.3d 1202, 1208 (10th Cir. 2001) ("[W]hen an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection." (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 680 (7th Cir. 1997))). In any event, on the merits, we disagree with Ms. DeWitt's criticism.

**i**

Ms. DeWitt's argument reflects a misunderstanding of the *McDonnell Douglas* framework. The pretext prong of that framework permits a plaintiff employee to raise a triable inference that the stated reasons for the adverse action underlying an employer's ostensibly honest belief are a pretext for discrimination. Consequently, this prong effectively allows an employee to demonstrate a triable inference that the employer's ostensibly honest belief in its stated reasons is not actually honestly held.

In this regard, once an employer has posited a legitimate, non-discriminatory reason for terminating an employee, the employee may access many evidentiary tools to expose its employer's stated reason as pretext. *See Kendrick*, 220 F.3d at 1230. For instance, an employee may raise a triable inference of pretext by showing "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in the employer's stated reason for terminating the employee. *See Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Morgan*, 108 F.3d at 1323). Moreover, showing disparate treatment—by demonstrating that the employer treated employees similarly situated to the plaintiff employee differently (i.e., more favorably)—is a particularly potent instrument to discredit an employer's allegedly legitimate reasons. *See Kendrick*, 220 F.3d at 1230. These are just two of many tools plaintiff employees may use to raise a triable inference of pretext and thereby undercut an employer's asserted honest belief.

Thus, the honest-belief doctrine does not eviscerate the third prong (i.e., pretext) of the *McDonnell Douglas* framework. Far from it. That prong contemplates that an employer will have professed honest belief in ostensibly legitimate, non-discriminatory reasons for its adverse action; but it establishes the context in which an employee may test the plausibility or coherency of the reasons supposedly underlying that honest belief with the aim of demonstrating that employer's belief actually may not be honestly held.

### ii

Ms. DeWitt cites *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285 (7th Cir. 1999) as "[a]n example of a court refusing to apply the Honest Belief doctrine in the context of a workplace rule violation." Aplt.'s Opening Br. at 29. Putting aside the obvious point that *Stalter*—a decision from a sister circuit—is not

20

binding on us, Ms. DeWitt's characterization of its holding is mistaken. *Stalter* actually makes clear that under *McDonnell Douglas*, "[w]e look not at the wisdom of the employer's decision, but rather at the *genuineness* of the employer's motives." 195 F.3d at 289 (emphasis added). In other words, far from rejecting it, the *Stalter* court focused its analysis on whether the employer's belief was honest (i.e., genuine).

Indeed, *Stalter* undermines—rather than supports—Ms. DeWitt's contention that the honest-belief rule effectively guts the pretext prong of *McDonnell Douglas* because the Seventh Circuit concluded that the *Stalter* plaintiff had established a triable issue of pretext regarding his race-based discrimination claim despite the employer's contention that the plaintiff's employment was terminated under a "sincere application" of its anti-theft policy. *Stalter*, 195 F.3d 285. More specifically, the employer, Wal-Mart, came forward with its reason for terminating the plaintiff—that is, theft, which amounted to "gross misconduct"—and the plaintiff responded with evidence of pretext by showing that (1) the severity of the punishment (i.e., termination) in relation to the offense—that is, "[e]ating a handful of [chips] from an open bag on a countertop in the lunchroom"—was so excessive that a reasonable jury could discredit the employer's "sincere" belief and (2) "a Caucasian employee who also committed gross misconduct," and was thus similarly situated, was not terminated. *Id.* at 287, 290–91. This evidence led the Seventh Circuit to rule

21

against the employer, to wit: "Because Stalter has raised genuine issues of material fact regarding whether that explanation is pretext for the true motivation for Stalter's termination, we reverse and remand for a trial on the disputed issues." *Id.* at 291–92.

*Stalter* well illustrates that, at bottom, Ms. Dewitt's problem is not the honest-belief rule, but rather her inability to marshal any evidence to undercut its operation. For example, despite Ms. DeWitt's suggestion that, like the *Stalter* plaintiff, she has suffered "excessive punishment," Aplt.'s Opening Br. at 30, that hardly squares with the record. From SWBTC's perspective, dropping customer calls is a serious and terminable offense in violation of its Code of Business Conduct. Ordinarily, it is not our role to second-guess an employer's assessment of the gravity of workplace misconduct. *See, e.g.*, *Young*, 468 F.3d at 1250 ("[O]ur role is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."). Moreover, especially in light of Ms. DeWitt's position as a customer service representative, responsible for handling customer calls, it certainly cannot be said here—as the Seventh Circuit could in *Stalter*—that the employer's assessment "does not pass the straight-face test" or that SWBTC's response in terminating Ms. Dewitt "strikes us as swatting a fly with a sledge hammer." *Stalter*, 195 F.3d at 290. Furthermore, unlike the *Stalter* plaintiff, Ms. DeWitt has shown no evidence of disparate treatment—*viz.*,

22

similarly situated employees outside of the relevant protected groups were treated more favorably than she was. In sum, Ms. DeWitt's reliance on *Stalter* is, to say the least, misplaced.

Ms. DeWitt next presumes that this court will adopt the Sixth Circuit's variation of the honest-belief doctrine, which requires that an employer "be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Because this rule conflicts with our precedent, we will not endorse it here.

*Smith* turns the third prong of the *McDonnell Douglas* framework on its head. It places the burden on the *employer* to show that it reasonably relied on particularized facts in the record in forming its honest belief; however, in construing the rubric of *McDonnell Douglas*, we have recognized no such employer burden. Rather, we have consistently held that, after an employer asserts a facially legitimate honest belief, the burden shifts to *the plaintiff* to show that the employer's proffered honest belief is in fact nothing more than a pretext for discrimination. An employer certainly can fortify its litigation position by identifying the particularized facts on which it reasonably relied in forming its

honest belief, but we do not read *McDonnell Douglas* as *requiring* the employer to do so.[4]

Ms. DeWitt also cites *Smith* to support her argument that, even if Ms. Baskett-McEnany's belief that she intentionally hung up on customers was sincere, a jury could still reasonably conclude that "such a belief was influenced by ignorance or stereotypes," and thus reflects discrimination. Aplt.'s Opening Br. at 31. Specifically, Ms. DeWitt points to Ms. Baskett-McEnany's stated inability to "reconcile why [Ms.] DeWitt could remember with explicit detail events throughout the day of the dropped calls, but could not remember" the dropped calls themselves. *Id.* at 32. Ms. DeWitt explains that "mental confusion during a low blood sugar episode is not inconsistent with being able to remember events before and after the low blood sugar episode when the blood sugar levels were higher and allowed for proper brain function." *Id.* Ms. DeWitt further agues that "[a] simple internet search of Type I diabetes and 'low blood sugar' leads to the American Diabetes Association website," which offers basic information about diabetes. *Id.* at 33. This argument is misguided.

---

[4] Even if we were free to apply the Sixth Circuit's variant of the honest-belief rule (which we are not), it would not benefit Ms. DeWitt. We have already identified the particularized facts on which Ms. Baskett-McEnany relied in forming her belief that Ms. DeWitt intentionally dropped the calls in Part IV.B.1, *supra*, and we could easily conclude that Ms. Baskett-McEnany reasonably relied on those facts.

Ms. DeWitt's ability to function before and after the dropped calls was only one factor Ms. Baskett-McEnany took into consideration. As noted *supra*, Ms. Baskett-McEnany also considered that "there are specific discrete steps that an agent has to take to acknowledge a call and to then hang up on a customer" which "require[] a level of coherence," Aplt.'s App. at 311, and that Ms. DeWitt continued to take calls after the dropped calls and at no point "took herself off the desk because she wasn't feeling well . . . which is what a rep does when they need to take a break or they can't take calls," *id.* at 313. In any event, Ms. Baskett-McEnany weighed the facts before her and concluded that Ms. DeWitt had intentionally hung up on the customers; in other words, she concluded the hang-ups were not caused by Ms. DeWitt's diabetes. And, as we have noted, whether Ms. Baskett-McEnany's conclusion was right or wrong—or the product of ignorance, for that matter—standing alone, is immaterial. Ms. DeWitt has not identified evidence upon which a jury could reasonably conclude that Ms. Baskett-McEnany's belief that Ms. DeWitt intentionally dropped the calls was the product of discriminatory intent.

**c**

Ms. DeWitt again falls short of the summary judgment hurdle when she asserts that the disputed propriety of putting Ms. DeWitt on a Last Chance Agreement raises a jury question as to pretext. Ms. DeWitt points to evidence that Ms. Baskett-McEnany told the human resources manager that Ms. DeWitt

25

unintentionally crammed the customer's account and that "it *could* have been an option not to discipline at all if she had believed [Ms.] DeWitt" acted unintentionally. Aplt.'s App. at 383 (emphasis added). This evidence is not material because the ADAAA does not require that employers choose the most lenient course of discipline, or in this case, no discipline at all. Again, "our role isn't to ask whether" SWBTC "was wise, fair or correct," in putting Ms. DeWitt on a Last Chance Agreement. *See Johnson*, 594 F.3d at 1211. The SWBTC Code of Business Conduct makes cramming a customer account a terminable offense—irrespective of whether the cramming was intentional.[5] That Ms. Baskett-McEnany had the option to impose a less severe disciplinary measure is irrelevant. What matters is whether Ms. Baskett-McEnany's intent in imposing the Last Chance Agreement was discriminatory, and Ms. DeWitt identifies no evidence in this regard.

**d**

Finally, Ms. DeWitt argues that Ms. Baskett-McEnany's failure to conduct a fair investigation of Ms. DeWitt's dropped calls raises an inference of pretext. "A 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext."

---

[5] Ms. DeWitt admitted as much in her deposition testimony. When asked if it would be "problematic" for "a service to be [mistakenly] added to a customer account without the customer knowing," Ms. DeWitt responded, "Yes." Aplt.'s App. at 189.

26

*Smothers*, 740 F.3d at 542 (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008)). But an employer may ordinarily "defeat the inference" of pretext stemming from an allegedly unfair investigation by "simply asking an employee for his version of events." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006); *see also Kendrick*, 220 F.3d at 1231 (declining to find an inadequate investigation where "[i]mportantly, in the course of his investigation [the decision-maker] asked the [plaintiff-employee] to give his version of the [events]").

As relevant here, Ms. DeWitt's unfair-investigation argument is overcome by the simple fact that Ms. Baskett-McEnany asked Ms. DeWitt for her version of events at the March 10 Day in Court. Ms. DeWitt cites only *Smothers* to support her claim and *Smothers* starkly contrasts with the situation here. In *Smothers*, an employee was terminated by his employer for his involvement in a quarrel with another employee. *See Smothers*, 740 F.3d at 533. The employee brought ADA discrimination and FMLA retaliation claims against the employer and, after the district court granted summary judgment in the employer's favor, we reversed. *Id.* In making the termination decision, the decision-makers never asked the plaintiff-employee for his side of the story, but instead relied entirely on information provided by biased subordinates. *Id.* at 542. We thus concluded that a reasonable jury could find the employer's investigation unfair and inadequate, and thereby infer that the employer's stated belief was mere pretext. *Id* at 543.

27

Here, Ms. DeWitt received a Day in Court, at which Ms. Baskett-McEnany asked Ms. DeWitt to "tell [her] anything" that Ms. DeWitt wanted Ms. Baskett-McEnany to know about the dropped calls. Aplt.'s App. at 326 (Day in Court Mins., dated Mar. 10, 2010). Ms. DeWitt explained that she suffered from low blood sugar on March 3, that she did not remember taking the dropped calls, and that symptoms related to her diabetes caused her to drop the calls. That Ms. Baskett-McEnany permitted Ms. DeWitt to explain her side of the story defeats any inference of an unfair investigation. Ms. Baskett-McEnany simply did not believe her.

More fundamentally, Ms. DeWitt identifies no evidence that suggests SWBTC's investigation was unfair. In this regard, Ms. DeWitt argues that Ms. Baskett-McEnany knew that Ms. DeWitt was locked out of her computer on March 3 but "took no steps to investigate whether [disability-related] reasons for getting locked out of the computer were what actually happened to [Ms.] DeWitt." Aplt.'s Opening Br. at 38. This assertion fails to establish an inference of pretext. Ms. DeWitt never discloses what additional investigative steps she believes Ms. Baskett-McEnany should have taken to determine the cause of the lock out. Nor, importantly, does she explain why Mr. Baskett-McEnany's failure to conduct further steps rendered the investigation unfair. Our focus here is not on whether SWBTC's investigation was optimal (i.e, text-book best practices); rather, it is on whether its investigation was fair. Ms. DeWitt offers no evidence

28

to establish that it was not.

In sum, Ms. DeWitt did not point to evidence that would call into question the employer's legitimate reason for terminating her employment. Her claim cannot survive the pretext inquiry of *McDonnell Douglas*.

## V

Ms. DeWitt next contends that the district court erred in granting summary judgment in favor of SWBTC on her ADAAA accommodation claim. Specifically, Ms. DeWitt argues that SWBTC discriminated against her by failing to accommodate her disability by excusing the disconnected calls that she claims were caused by her disability. Because we discern no reversible error in this aspect of the district court's ruling, we affirm.

## A

The ADAAA prohibits an employer from "unlawfully 'discriminat[ing]' against an employee by failing to 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." *C.R. Eng., Inc.*, 644 F.3d at 1048 (second alteration in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). "The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them." *Id.* (quoting *Selenke*, 248 F.3d at 1261).

The ADAAA defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily

29

accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(A)–(B); *accord* 29 C.F.R. § 1630.2(o).

"To facilitate the reasonable accommodation, '[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties.'" *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004) (alteration in original) (quoting *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)). "However, before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *C.R. Eng., Inc.*, 644 F.3d at 1049.

**B**

Ms. DeWitt's accommodation claim fails because she did not request a reasonable accommodation to address concerns regarding the possibility of dropped calls; instead, she requested retroactive leniency for her misconduct. Specifically, Ms. DeWitt requested that SWBTC overlook that she hung up on at least two customers while on a Last Chance Agreement. Such retroactive

leniency is not a "reasonable accommodation" as defined by the ADAAA.

**1**

The ADAAA does not require employers to reasonably accommodate an employee's disability by overlooking past misconduct—irrespective of whether the misconduct resulted from the employee's disability. The Equal Employment Opportunity Commission's ("EEOC") Enforcement Guidance makes clear that the requirement to provide reasonable accommodations under the ADAAA is "always prospective," and that "an employer is not required to excuse past misconduct even if it is the result of the individual's disability." U.S. EQUAL OPPORTUNITY EMPLOYMENT COMM'N, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT AT NO. 36; *see also id.* at No. 35 ("An employer never has to excuse a violation of a uniformly applied conduct rule that is job-related and consistent with business necessity."). A panel of this court in an unpublished decision has similarly held that "excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an *after-the-fact excuse* is not a required accommodation under the ADA." *Davila v. Quest Corp., Inc.*, 113 F. App'x 849, 854 (10th Cir. 2004) (emphasis added).

Several of our sister circuits have reached the same conclusion. *See, e.g.*, *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("A requested accommodation that simply excuses past misconduct is unreasonable as a matter

31

of law."); *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) ("[Plaintiff] did not request a disability accommodation, she asked for a second chance to better control her treatable medical condition. That is not a cause of action under the ADA."); *Burch v. Coca Cola Co.*, 119 F.3d 305, 319 n.14 (5th Cir. 1997) ("[A] 'second chance' or a plea for grace is not an accommodation as contemplated by the ADA."); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666–67 (7th Cir. 1995) ("[Plaintiff] is not asking for an accommodation; he is not asking [his employer] to change anything. He is asking for another chance . . . . But the ADA does not require this.").

Bolstered by the plain language of the EEOC guidance and the persuasive conclusions reached by our panel in *Davila* and in our sister circuits, we are confident that the ADAAA does not require employers to accommodate disabled employees by overlooking a past violation of a workplace rule, regardless of whether that violation was caused by the employee's disability. Accordingly, SWBTC was not required to accommodate Ms. DeWitt by overlooking her March 2010 dropped calls while she was on a Last Chance Agreement, and Ms. DeWitt's ADAAA accommodation claim must fail.

**2**

In its *amicus curiae* brief, the EEOC argues that Ms. DeWitt's disconnected calls constituted a violation of performance standards, not a conduct rule. According to the EEOC, while "[t]he basic rule that an employer is not required

to 'excuse' past poor performance still holds with respect to performance standards. . . . an employer is [not] categorically free to terminate any and all disabled employees *at the first instance* of any and all disability-related performance deficiencies." EEOC Br. at 32 (emphasis added). We reject the EEOC's argument.

At the outset, we are convinced that Ms. DeWitt's misconduct—hanging up on at least two customers—constitutes a violation of a conduct rule. "The ADA generally gives employers wide latitude to develop and enforce conduct rules," so long as the "conduct rule [is] job-related and consistent with business necessity . . . ." EEOC FACT SHEET, THE AMERICANS WITH DISABILITIES ACT: APPLYING PERFORMANCE AND CONDUCT STANDARDS TO EMPLOYEES WITH DISABILITIES ("Fact Sheet") § III(B)(9). The Fact Sheet goes on to include a non-exclusive list of "[c]ertain conduct standards that exist in all workplaces and cover all types of jobs" that "always meet this standard," including a requirement that employees "show respect for, and deal appropriately with, clients and customers." *Id.*

In light of this EEOC guidance, the SWBTC Code of Business Conduct's requirement that employees treat customers "in a professional, courteous manner," Aplt.'s App. at 252, is undoubtedly a conduct rule, and it cannot seriously be argued in the customer-service setting, where Ms. Dewitt worked, that such a rule is not job-related and consistent with business necessity. And

33

hanging up on customers is certainly a violation of this conduct rule. Ms. DeWitt therefore is nothing less than a repeat violator, having hung up on at least two customers. Therefore, the ADAAA does not require SWBTC to ignore or overlook Ms. DeWitt's dropped calls.

Even if we were to adopt the EEOC's characterization of Ms. DeWitt's dropped calls as a violation of performance standards (which we do not), SWBTC still was not obligated to overlook Ms. DeWitt's shortcomings. Performance standards relate to the "quantitative and qualitative requirements for performance of essential functions" of a particular job. Fact Sheet § III(A)(1). And the ADAAA permits "an employer [to] apply the same [performance standards] to an employee with a disability that it applies to employees without disabilities." *Id.* Therefore, so long as SWBTC would require non-disabled employees under a Last Chance Agreement to refrain from dropping calls—and this cannot be disputed— it could require Ms. DeWitt to refrain from doing so. Moreover, given the centrality of customer service to Ms. DeWitt's job, it could not be plausibly argued that this ostensible performance standard was a "marginal" part of her duties, such that SWBTC was required to permit Ms. DeWitt to sidestep it. *Id.* Example 1 & § III(A)(6).

The EEOC further argues that the timing of Ms. DeWitt's request for an accommodation is irrelevant because "[t]he ADA does not compel employees to ask for accommodations at a certain time." *See id.* § III(A)(5). The Fact Sheet

34

explains that an employee "may ask for [a] reasonable accommodation before or after being told of performance problems" because "[s]ometimes, an employee may not know or be willing to acknowledge that there is a problem requiring accommodation until the employer points out deficiencies in performance." *Id.* Critically, however, the Fact Sheet indicates that nevertheless "the timing of a request for reasonable accommodation is important," *id.*, and (at the very least) it strongly suggests that an employer is not obliged to apply the brakes on an ongoing disciplinary process based on past performance deficiencies simply because an employee requests an accommodation, *see id.* Example 9 ("The employer may refuse the request for reasonable accommodation and proceed with the termination because an employer is not required to excuse performance problems that occurred prior to the accommodation request. . . . This employee waited too long to request reasonable accommodation."). Consequently, even under the EEOC's own Fact Sheet, SWBTC would not have been obligated to stay its disciplinary hand—based on Ms. DeWitt's dropped calls under a Last Chance Agreement—simply because she purported to request, at the eleventh hour, an accommodation.

In sum, because a denied request for retroactive leniency cannot support an accommodation claim, and nothing in the EEOC's policy guidance or other authorities barred SWBTC from disciplining Ms. DeWitt for her conduct, Ms. DeWitt's accommodation claim must fail. We thus affirm the district court's

35

grant of summary judgment to SWBTC on Ms. DeWitt's ADAAA accommodation claim.

## VI

Finally, Ms. DeWitt argues that the district court erred in granting summary judgment in favor of SWBTC on her FMLA retaliation claim. Specifically, Ms. DeWitt argues that SWBTC terminated her employment because she took FMLA leave. Because we conclude that Ms. DeWitt has not raised a triable issue of fact on the pretext component of her retaliation claim, we affirm this final aspect of the district court's ruling.

## A

"The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination . . . [for] 'a serious health condition.'" *Smothers*, 740 F.3d at 539 (alteration in original) (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007)); *see* 29 U.S.C. § 2612(a)(1)(D) ("[A]n eligible employee shall be entitled to [FMLA leave] [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."). The FMLA further provides that an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). "We have construed this provision of the FMLA as creating a retaliation theory of recovery." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1004 (10th Cir.

36

2011) (citing *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006)). Therefore, "[i]t is unlawful for an employer to retaliate against an employee for taking FMLA leave." *Smothers*, 740 F.3d at 539–40.

As with Ms. DeWitt's ADAAA termination claim, "[r]etaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas*." *Metzler*, 464 F.3d at 1170; *see also Debord v. Mercy Health Sys. of Kan.*, 737 F.3d 642, 655 (10th Cir. 2013) (noting that "[w]here, as here, the plaintiff does not have direct evidence of retaliation, we follow the three-step framework from *McDonnell Douglas*"). "Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation," by proving that "(1) she engaged in a protected activity; (2) [the defendant] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Metzler*, 464 F.3d at 1170–71 (footnote omitted); *see also Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012) ("A prima facie retaliation case is made if the plaintiff shows that she engaged in protected opposition to discrimination, and, as a result, suffered materially adverse action . . . ." (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))). Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant to "offer a legitimate, non-retaliatory reason for the employment action.

37

The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." *Metzler*, 464 F.3d at 1170 (citation omitted).

**B**

Ms. DeWitt easily satisfies the first two requirements of her prima facie case for her FMLA retaliation claim: (1) she "engaged in a protected activity by taking FMLA leave" and (2) "any reasonable employee would have found termination materially adverse." *See id.* at 1171. Assuming, *arguendo*, that Ms. DeWitt also satisfies the third and final element of the prima facie case for FMLA retaliation—that is, showing a causal connection between the protected activity and the adverse action—we turn to the other components of the *McDonnell Douglas* framework. As with Ms. DeWitt's ADAAA termination claim, SWBTC has carried its burden to show a legitimate, non-retaliatory reason for terminating Ms. DeWitt's employment: that is, Ms. DeWitt intentionally hung up on at least two customers, a violation of the Code of Business Conduct, while subject to a Last Chance Agreement. The burden thus shifts to Ms. DeWitt to identify evidence upon which a rational jury could reasonably find that SWBTC's stated reason for terminating Ms. DeWitt's employment was mere pretext for FMLA retaliation. Ms. DeWitt has not carried her burden.

**1**

Ms. DeWitt again relies on the animus of Ms. Kloxin to support her pretext argument. But, again, Ms. Kloxin was not a decision-maker with regard to Ms.

38

DeWitt's termination; the decision to terminate Ms. DeWitt's employment was made by Ms. Baskett-McEnany, in consultation with Mr. Rivera. Ms. DeWitt points to no evidence that Ms. Baskett-McEnany (or even Mr. Rivera) shared Ms. Kloxin's animus for Ms. DeWitt, or that she was influenced by Ms. Kloxin's animus in making the decision to terminate Ms. DeWitt. In particular, as to Ms. Baskett-McEnany, there is no evidence that she had any knowledge of Ms. Kloxin's animus for Ms. DeWitt, let alone relied on it to terminate Ms. DeWitt's employment.[6] Therefore, evidence of Ms. Kloxin's animus toward Ms. DeWitt does not raise a jury question as to whether SWBTC fired Ms. DeWitt because she took FMLA leave.

## 2

Ms. DeWitt next points to Ms. Garcia's testimony to show pretext. Specifically, Ms. Garcia stated that SWBTC employees that used FMLA leave were "targeted as employees that [SWBTC] wanted to terminate" and that SWBTC "looked for other reasons to terminate that employee." Aplt.'s App. at 440. Additionally, Ms. Garcia specifically identified Ms. DeWitt as an employee on the "target list" for having used FMLA leave. *Id.* at 441.

---

[6] Mr. Rivera was aware of it of course, but rather than endorse it, he affirmatively rejected it: When Ms. Kloxin displayed animus for Ms. DeWitt by dancing and exclaiming that she "finally got that bitch," Mr. Rivera told Ms. Kloxin that her behavior was "not appropriate." Aplt.'s App. at 458.

39

Ms. Garcia's statements amount to no more than speculation as to SWBTC's motive for terminating Ms. DeWitt's employment, and thus provide no support for Ms. DeWitt at the summary-judgment stage. First, Ms. Garcia played no part in SWBTC's decision to terminate Ms. DeWitt's employment. In fact, Ms. Garcia's employment with SWBTC ended more than a year before Ms. DeWitt crammed a customer's account in January 2010; thus, Ms. Garcia has no first-hand knowledge of the circumstances surrounding Ms. DeWitt's termination. Second, Ms. Garcia never identified Ms. Baskett-McEnany as being among the managers in attendance at the meetings where FMLA leave was discussed. Therefore, Ms. Garcia's testimony fails to raise a jury question as to whether Ms. Baskett-McEnany's decision to terminate Ms. DeWitt was actually retaliation for Ms. DeWitt's use of FMLA leave.

In sum, even assuming that Ms. DeWitt has made a prima facie FMLA retaliation case, we conclude that SWBTC is entitled to summary judgment because (1) it advanced a legitimate, non-retaliatory reason for taking adverse employment action against Ms. DeWitt—i.e., Ms. DeWitt's hanging up on customers while on a Last Chance Agreement, and (2) Ms. DeWitt failed to demonstrate that SWBTC's stated reason for its disciplinary action was pretextual. Consequently, we affirm this aspect of the district court's ruling.

40

## VII

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of SWBTC on all claims.