**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JIMMY GARDENHIRE,

    Plaintiff - Appellant,

v.

JOHNS MANVILLE,

    Defendant - Appellee.

No. 17-3048
(D.C. No. 5:15-CV-04914-DDC)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BALDOCK**, **KELLY**, and **O'BRIEN**, Circuit Judges.
_____

In this employment discrimination case, Jimmy Gardenhire appeals from a district

court order that granted summary judgment to his employer, Johns Manville (JM).

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**BACKGROUND**

In 2007, Gardenhire began working as a machine attendant for JM, a manufacturer

of fiberglass insulation. JM eventually promoted Gardenhire to an inspector-packer

position, which required that he "[p]repare, remove, pack, scrap or otherwise dispose

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of[ ] all [insulation] material coming from the [production line]." Aplt. App., Vol. I at 144. These activities involved manually picking up and moving insulation items "all day long." Aplee. Supp. App. at 73.

In December 2012, Gardenhire broke his left elbow while ice skating. An orthopedic surgeon imposed work restrictions of one-handed jobs only and no left-handed lifting for four weeks. Consequently, Gardenhire began taking FMLA leave and short-term disability leave. After Gardenhire's FMLA leave expired, his doctor, James Bogener, M.D., provided a medical note dated April 17, 2013, extending the restrictions for six more weeks. On June 5, 2013, Dr. Bogener again extended Gardenhire's restrictions for six weeks.

After the short-term disability coverage ended on June 29, Gardenhire sought permanent and total disability benefits from JM's insurer. On the disability application, Gardenhire indicated he could not work because, among other things, elbow weakness prevented him from lifting insulation rolls and pulling them apart. Dr. Bogener submitted an attending-physician statement, stating that Gardenhire was restricted to one-handed jobs through at least August 7, pending a re-evaluation of Gardenhire's status. The insurer denied Gardenhire's application.

On July 29, 2013, JM's regional human-resources manager, Shirley Vawter, sent Gardenhire a letter, seeking information about his return to work. She noted that his "leave [had] continued to be extended several times until the now current expected return to work date of August 8, 2013," and that further medical information was needed "to determine what further reasonable accommodations [JM could] offer." *Id.* at 153. She

2

instructed Gardenhire to "discuss with [his] physician [his] day to day [job] responsibilities," *id.* at 153, and she attached to the letter various forms, including a "Request for Medical Information for Reasonable Accommodation," *id.* at 156.

On August 9, Dr. Bogener completed the reasonable-accommodation form, stating that Gardenhire could perform "[o]ne handed job[s] only, [with] no lifting [using] the left hand." *Id.* at 232. Dr. Bogener indicated he would re-assess Gardenhire's condition on August 21. *Id.* On that date, Dr. Bogener completed another work-restrictions note, stating that Gardenhire could perform only "one-handed job[s] [requiring] no lifting with the left hand for six [more] weeks." Aplt. App., Vol. I at 158.

Vawter considered whether JM could reasonably accommodate Gardenhire's restrictions, but ultimately concluded no reasonable accommodation was available. She then decided to terminate Gardenhire, effective August 30, 2013.

Nearly eight months later, in April 2014, Gardenhire contacted Dr. Bogener and requested a full work release, retroactive to September 1, 2013. "[B]ased on the information Mr. Gardenhire provided, [Dr. Bogener] signed a return to work form indicating Mr. Gardenhire felt he was ready to return to work on September 1, 2013." Aplee. Supp. App. at 165.

Gardenhire administratively challenged his termination and then sued JM in federal court. He advanced claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213; the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to

3

2000e-17.  JM successfully moved for summary judgment on all of Gardenhire's claims.[1]

Gardenhire now appeals.

## DISCUSSION
### I.  Standards of Review

We review a district court's grant of summary judgment de novo.  *Emcasco Ins. Co. v. CE Design, Ltd.*, 784 F.3d 1371, 1378 (10th Cir. 2015).  In doing so, we "view the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  *Id.* (internal quotation marks omitted).  "We will uphold the district court's grant of summary judgment only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

### II.  ADA Claim

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless "the accommodation[s] would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).  When a claim alleging a violation of the ADA is based on circumstantial evidence, we apply the familiar *McDonnell Douglas*[2] burden-shifting framework.  *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017).  Under

---

[1] Gardenhire argues that the district court entered summary judgment on issues not raised by JM.  We disagree.  JM's summary-judgment motion adequately targeted all of the issues identified in the district court's pretrial order, which "supersede[d] the pleadings and control[ed] the subsequent course of litigation," *Hullman v. Bd. of Trs. of Pratt Cmty. Coll.*, 950 F.2d 665, 667 (10th Cir. 1991).

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

4

that framework, a plaintiff must first establish a prima facie case of discrimination by showing that: "(1) he is disabled (or perceived as disabled) as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability." *Id.* (internal quotation marks omitted). The failure to provide reasonable accommodations constitutes disability discrimination under the ADA. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 n.12 (10th Cir. 1999) (en banc). As we explain below, Gardenhire's ADA claim fails the second prong of the prima-facie test.

## A. Essential Functions

Gardenhire argues that his medical restriction on lifting with his left arm did not prevent the performance of his job's essential functions.

> Evidence of whether a particular function is essential to a job includes (but is not necessarily limited to) (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs.

*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 887 (10th Cir. 2015) (internal quotation marks omitted).

JM contends that lifting with both arms is an essential function of the inspector-packer position. We agree. The written job description for the inspector-packer position states that the employee must "remove . . . all material coming from the machine" and "[s]et aside defective material." Aplt. App., Vol. I at 144. Gardenhire testified that the removal of materials, which typically weigh between "25 to

5

55 pounds," Aplee. Supp. App. at 21, was accomplished by "grab[bing] them" and "lift[ing] them" with his "arms," Aplt. App., Vol. I at 148. Although he could sometimes use just one arm, the job at other times "required [him] to use two hands . . . to be able to lift some material from one area to the next" and to "throw it to another location." Aplee. Supp. App. at 22. We conclude that no reasonable jury could find that Gardenhire was able to perform the essential functions of his job using just one arm.

## B. Reasonable Accommodations

"The determination of whether a requested accommodation is reasonable must be made on the facts of each case taking into consideration the particular individual's disability and employment position." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) (internal quotation marks omitted). "[A]n employee's request to be relieved from an essential function of [his] position is not, as a matter of law, a reasonable or even plausible accommodation." *Id.* at 1051 (internal quotation marks omitted).

Gardenhire argues JM should have accommodated his injury by "providing him additional leave beyond August 30, 2013," his termination date. Aplt. Opening Br. at 34. He stresses that Dr. Bogener released him to work without any restrictions just two days later. Although "a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation," an employer "[i]s not required to wait indefinitely for [the employee's] recovery." *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996). JM allowed Gardenhire eight months of continuous leave before finally terminating him. Gardenhire does not cite any

6

evidence that he notified JM *contemporaneously to his termination* that Dr. Bogener had removed his work restrictions.  Indeed, Dr. Bogener did not execute the medical-release form until April 2014—nearly eight months after JM terminated Gardenhire.[3]  No reasonably jury could find that JM failed to reasonably accommodate Gardenhire's injury.

### C.  100%-Healed Policy

Gardenhire suggests he need not establish a prima facie case because he has direct evidence of discrimination.  *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n.3 (10th Cir. 1997) (stating that "[i]f the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate").  Specifically, he claims that JM requires employees to be 100% healed before allowing them to resume work.  Granted, such policies are considered discriminatory because they "permit[ ] employers to substitute a determination of whether a qualified individual is 100% healed from their injury for

---

[3] In an attempt to show he was in fact released to work on September 1, 2013, Gardenhire points to a Kansas Department of Labor form purportedly signed by Dr. Bogener.  On the form, which is dated October 9, 2013, a box is checked indicating that Gardenhire "[w]as able to return to full-time work on . . . 9/1/13."  Aplt. App., Vol. I at 234.  But nothing on the form indicates that Gardenhire *obtained* a medical release before April 2014.  Nor does Gardenhire explain when, or even if, he provided this form to JM.  More troubling is Dr. Bogener's affidavit testimony casting doubt on the form's authenticity.  *See* Aplee. Supp. App. at 165 (Dr. Bogener stated that he filled out a Department of Labor form on September 10, 2013, which provided that "Gardenhire was *unable* to work and that he was restricted to performing one handed jobs only as he could not lift with his left hand."  (emphasis added)).

the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation." *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (internal quotation marks omitted); *see also Martin v. Kansas*, 190 F.3d 1120, 1134-35 (10th Cir. 1999), *overruled on other grounds, Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373-74 (2001).

But there are two problems with Gardenhire's position. First, he has not raised a triable issue as to whether JM has such a policy. To show the existence of 100%-healed policy, Gardenhire cites the deposition testimony of a human-resources associate, Janet Duerksen. She testified: "As far as I know, we have never allowed an hourly employee to return [to work] with restrictions." Aplt. App., Vol. I at 168.

The district court found this testimony entirely speculative. We agree. When asked about her role in applying "company rule[s], polic[ies], or practice[s]," Duerksen said she "just . . . ma[de] the appropriate phone calls," provided phone numbers, and referred employees' injury-related issues to Vawter (JM's regional human-resources manager). *Id.* at 165; *see also id.* at 187. Indeed, Duerksen characterized her job as "clerical" in nature when it came to "leave and benefits and accommodations." *Id.* at 187. Further, Duerksen provided contradictory testimony about whether JM allows employees to return to work with restrictions: "I believe when there's a worker comp injury, [JM] sometimes allows [employees] to work with some restrictions." *Id.* at 186.

8

Given that Duerksen served as little more than a conduit between employees and Vawter, her testimony about the existence or extent of JM's personnel policies is not sufficient to create a triable issue of fact about a 100%-healed policy. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004) ("Testimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment."); *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995) (Testimony that would be inadmissible at trial—because it is not based on personal knowledge, or because it constitutes hearsay—cannot defeat a summary judgment motion.). Moreover, it is undisputed that in July 2013, Vawter attempted to ascertain from Gardenhire whether there were any "reasonable accommodations" that might allow him to return to work. Aplee. Supp. App. at 153. Such an attempt is inconsistent with the existence of a 100%-healed policy.[4]

Second, a 100%-healed policy "cannot give rise to a finding of liability and relief under the ADA without the statutorily required inquiry into whether those affected by [the] policy are disabled and able to perform the essential functions of the jobs they seek or desire with or without reasonable accommodation." *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 195 (3d Cir. 2009). As discussed above, Gardenhire has not shown a triable issue as to whether he could perform the essential functions of his job with or

---

[4] The evidence of Vawter's accommodation attempt also forecloses Gardenhire's assertion that JM "does not have an interactive process, procedure, protocol, practice or rule," Aplt. Opening Br. at 30; *see Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017) ("To facilitate the reasonable accommodation, the federal regulations implementing the ADA envision an interactive process that requires participation by both parties." (brackets and internal quotation marks omitted)).

9

without a reasonable accommodation. Thus, whether or not JM had a 100%-healed policy has no bearing on Gardenhire's ADA claim. *See, e.g.*, *Moore v. Jackson Cty. Bd. of Educ.*, 979 F. Supp.2d 1251, 1266 (N.D. Ala. 2013).

### III. FMLA Claims
### A. Retaliation

"The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination for a serious health condition." *Dewitt*, 845 F.3d at 1318 (brackets, ellipsis, and internal quotation marks omitted). "[I]t is unlawful for an employer to retaliate against an employee for taking FMLA leave." *Id.* (internal quotation marks omitted).

Without direct evidence of retaliation, Gardenhire must "establish[ ] a prima facie case of retaliation[ ] by proving that (1) [ ]he engaged in a protected activity; (2) [JM] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* (internal quotation marks omitted). The district court concluded Gardenhire failed to show causation. Specifically, Gardenhire's FMLA leave expired by April 2013, but JM did not take any adverse action against him until August 30, 2013, when it fired him. As the district court noted, a nearly five-month gulf between the expiration of FMLA leave and an adverse employment action is insufficient to establish causation. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding that a three month period, standing alone, is too long to infer causation from temporal proximity). With no other causal evidence, the district court determined that summary judgment was

10

appropriate. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[U]nless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.").

On appeal, Gardenhire does not address the district court's causal determination. He has, thus, waived any challenge to that determination. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed."). In any event, we have reviewed the district court's determination, and we conclude that summary judgment was appropriate on his FMLA retaliation claim.

## B. Interference

Gardenhire asserts that JM's "100% healed practice . . . interfered with [his] right to be restored to his position during the initial 12 weeks of his leave." Aplt. Opening Br. at 45. To establish a prima facie case of FMLA interference, Gardenhire must show that (1) he was entitled to FMLA leave, (2) JM took some adverse action that interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of his FMLA rights. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006). Employees who take FMLA leave are entitled, upon their return, to be restored to the job they held when the leave commenced or to be restored to an equivalent job with equivalent benefits, pay, and other employment terms and conditions. *See* 29 U.S.C. § 2614(a)(1).

11

The district court concluded that Gardenhire's interference claim failed the adverse-action prongs of a prima facie case. Specifically, the district court observed that when JM fired Gardenhire, he had no right to reinstatement because his FMLA leave had expired almost five months earlier. Although the district court's observation is accurate, we conclude that summary judgment was appropriate on this claim because (1) as we noted earlier, Gardenhire has not shown a triable issue as to whether JM even had a 100%-healed policy; and (2) even if such a policy existed, the FMLA allows an "employer to have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work." *Id.* § 2614(a)(4). Thus, summary judgment was appropriately granted on Gardenhire's FMLA interference claim.

## IV. Title VII Claim

Gardenhire contends that "Caucasian employees were promoted before him," were assigned less difficult jobs, and were supervised less "oppressively." Aplt. Opening Br. at 47. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Generally, to make out a prima facie case of discrimination, an employee must show (1) membership in a protected class; (2) an adverse employment action; and (3) that the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). "One of the ways [the] third prong may be met . . . is by attempting to show that the

12

employer treated similarly situated employees differently." *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000).

The district court concluded that Gardenhire's prima-facie case failed at the third prong because the two Caucasian employees he identified as receiving better treatment— Jimmy Yianakopulos and Lonnie Kent—were not similarly situated in material respects. On appeal, Gardenhire does not address the district court's conclusion. He has, thus, waived any challenge to the district court's conclusion. *See Utahns for Better Transp.*, 305 F.3d at 1175.

Instead, Gardenhire cites his affidavit statements that (1) "[t]he other black employees of [JM] . . . all discussed with me how they were put in the most difficult jobs, were treated less favorably than Caucasian employees and were oppressively supervised"; and (2) "[JM] refused to accommodate [another black employee] and fired him." Aplt. App., Vol. I at 142. But these affidavit statements are wholly insufficient to avoid summary judgment. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201-02 (10th Cir. 2015) (observing that inadmissible hearsay statements cannot defeat summary judgment and that "conclusory and self-serving affidavits" carry no weight (internal quotation marks omitted)).

## CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Bobby R. Baldock
Circuit Judge

13