**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 23, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LI ZU,

     Plaintiff - Appellant,

v.

AVALON HEALTH CARE, INC., a
corporation d/b/a Avalon Health Care
Group; AVALON VALLEY
REHABILITATION CENTER, LLC,

     Defendants - Appellees.

No. 18-4153
(D.C. No. 2:15-CV-00845-CW)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **MORITZ**, and **CARSON**, Circuit Judges.[**]
_____

Plaintiff Li Zu, proceeding pro se, appeals the district court's grant of

summary judgment to her former employer on her claims of national-origin

discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Utah Antidiscrimination Act (UADA). We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.

In June 2012, Plaintiff began working part-time as a registered nurse (RN) at a skilled nursing facility in Utah. Defendants Avalon Health Care, Inc. and Avalon Valley Rehabilitation Center (collectively "Avalon") operated that facility.[1] At the time, Plaintiff had a bachelor's degree in nursing and twenty years' experience as a nurse. Plaintiff, who is Chinese, also held an Employment Authorization Document (EAD) allowing her to work in the United States.

Shannon Oliver and Amy Griffis—the facility's Director of Nursing and Assistant Director of Nursing, respectively—were the two Avalon employees who had actually hired Plaintiff as an RN. Of note, they had both known that she was Chinese when they had done so. Further, Oliver promoted Plaintiff to a full-time RN position in December 2012. Plaintiff soon thereafter obtained a master's degree in nursing administration.

In October 2013, Oliver, who was also Plaintiff's direct supervisor, gave Plaintiff a written performance appraisal. Oliver checked a box indicating that Plaintiff "consistently [met] but [did] not exceed performance objectives" and was "fully competent and . . . satisfactorily performing the job." R., Vol. 1 at 408. More

---

[1] Defendants stipulated that the district court could assume they were joint employers for purposes of their summary judgment motion. See Supp. R., Vol. 1 at 39.

particularly, Oliver noted a number of Plaintiff's positive attributes, including "excellent attendance," punctuality, a willingness "to pick up . . . extra shifts if needed," "thorough" admissions, and an ability to "work well independently." Id. at 409. But Oliver reported that Plaintiff had some problems and could improve in some respects. For example, Oliver stated that although Plaintiff had "strong nursing skills," she "could improve on [her] response to [a] change in condition of [her] residents." Id. at 409. Oliver observed that Plaintiff "complete[d] work as assigned in assigned time" but "could improve by not making personal calls or using the computer for personal use during working hours" and "need[ed] to respond to call lights and emergency calls to assist with falls and codes no matter where it is in the building." Id. And although Plaintiff was "pleasant and cooperative" and "usually work[ed] well with others," she "could improve on teamwork by assisting with call lights, helping out on unit when the hall is busy, and offering to help the other nurses," and "could work on developing a better working relationship with [certified nursing assistants]." Id.

Perhaps most importantly for purposes of Plaintiff's claim of national-origin discrimination, Oliver made the following comments about Plaintiff's ability to communicate:

> You have improved on your verbal communication skills. At times you have *communication problems* with residents or their families *due to language barrier* but utilize your coworkers to make sure you get the accurate information. Your written documentation is clear and concise. You are courteous towards residents and their families. Make sure to communicate with [certified nursing assistants] in a respectful manner.

Id. (emphases added).

Oliver later stated in a sworn declaration that "Plaintiff speaks English with a thick accent and often has difficulty understanding others and making herself understood." Id. at 439. Oliver and Griffis both stated they personally observed that various doctors, staff, facility residents, and families of facility residents "frequently had trouble understanding Plaintiff or confirming that she had understood them," and these "communication difficulties created additional work for [Plaintiff's] co-workers (who often had to play the role of interpreter) and caused considerable frustration and tension among doctors, residents, and staff." Id. at 439 (Oliver), 451 (Griffis).

Around the time of Plaintiff's performance appraisal in October 2013, a nursing instructor informed Oliver that Plaintiff had been "refusing [to mentor] nursing students," which was one of Plaintiff's job responsibilities, "because [Plaintiff] could not communicate with them." Id. at 505.

A few weeks prior to the November 16, 2013 expiration date on Plaintiff's EAD, Plaintiff informed Oliver that she would not be able to renew her EAD before it expired. On November 13, 2013, Plaintiff voluntarily terminated her employment because of her imminent ineligibility to work legally in the United States.

In December 2013, after Plaintiff had renewed her EAD, she applied for four positions at Avalon—three RN positions and one as Resident Assessment Coordinator (RAC). She was not hired for any of those positions, but only Avalon's decision not to hire her for the RAC position is at issue in this appeal. The RAC position required, among other things, that an applicant be "a good communicator,"

4

"well-versed in inter-personal communications," and "familiar with the RAI [Resident Assessment Instrument] process." R., Vol. 3 at 67. The RAI "is commonly referred to as the 'MDS,' which stands for Material Data Set and is the document used to support the facility's request for reimbursement for services from Medicare and other payors." Id., Vol. 1 at 279.

Plaintiff notified Oliver by text message that she had applied for the RAC position and one of the RN positions. Oliver responded that Avalon had "already made a decision on [the RAC] position" and hired "someone with experience in mds's." Id. at 447. Oliver added that the RN position had already been filled but was not yet "closed out," and she "currently [had] no needs." Id. But Oliver told Plaintiff she should "[a]pply at other Avalon position[s] too," and that Oliver would "give [her] a good reference." Id.

In February 2014, Plaintiff contacted Byron Kirton, a Vice President of Human Resources at Avalon Health Care Management, Inc. (one of Avalon's subsidiary companies that provides certain support services to Avalon). Plaintiff contended that the refusal to hire her for the RAC position was discriminatory. Kirton told Plaintiff that he would look into it. After doing so, Kirton responded by email that he had reviewed Plaintiff's performance appraisal documenting her average performance and communications difficulties, and he concluded that "there is no discrimination occurring but rather as Avalon . . . makes new hire decisions they are selecting applicants that have stronger communication skills and a better ability to collaborate with coworkers." Id. at 385. Kirton added that "as a company we were not

impressed that you waited so long to renew your visa," which did "not preclude . . . rehire" but raised concern about Plaintiff's "attention to detail in the important matters and did put the facility in a tough spot with the need to replace [her] in the schedule [on] short notice." Id.

In March 2014, Plaintiff filed an administrative charge of discrimination with the Utah Antidiscrimination and Labor Division of the Utah Labor Commission.

In August 2014, Plaintiff sent an email to an employee of Avalon Health Care Management complaining that Avalon had either given her "bad [job] references or refused to give a reference," which was "preventing [her] from getting a new job," and asked the employee to "put a stop to it." Id. at 485. A few weeks later, Plaintiff emailed Kirton and two of his colleagues "a formal complaint for discrimination and retaliation," alleging that Avalon "refused to give [her] a job reference or gave an unfavorable job reference to [her] prospective employers." Id. at 387.

Plaintiff later filed another charge of discrimination and retaliation with the Equal Employment Opportunity Commission and ultimately received a right-to-sue letter.

Plaintiff's operative amended complaint in this action advances claims of national-origin discrimination and retaliation under Title VII and the UADA. Her complaint also alleges age discrimination. Avalon moved for summary judgment. A magistrate judge issued a report recommending that the district court grant summary judgment on her age-discrimination claim and the portion of her national-origin claim concerning the RN positions. At the same time, the magistrate judge recommended

6

that the district court deny summary judgment on Plaintiff's national-origin claim regarding the RAC position and her retaliation claim.

Avalon objected to the portions of the report recommending denial of summary judgment, but Plaintiff urged the district court to adopt it in its entirety. The district court ultimately adopted the report to the extent the magistrate judge had recommended granting summary judgment to Avalon. But the district court also declined to adopt the recommendation that it deny summary judgment on the national-origin and retaliation claims. In sum, the district court thus granted summary judgment to Avalon on all of Plaintiff's claims. Plaintiff appeals only the grant of summary judgment on her national-origin claim regarding the RAC position and on her retaliation claim.

## II.

We review an order granting "summary judgment de novo, applying the same standards that the district court should have applied." Fields v. City of Tulsa, 753 F.3d 1000, 1008 (10th Cir. 2014) (internal quotation marks omitted). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the nonmoving party." Fields, 753 F.3d at 1009 (internal quotation marks omitted). Because Plaintiff is pro se, we construe her fillings liberally, but we may not act as her advocate. Yang v. Archuleta, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

7

## III.

## A.

Both Title VII and the UADA prohibit discrimination based on national origin. See 42 U.S.C. § 2000e-2(a)(1); Utah Code Ann. § 34A-5-106(1)(a)(i)(G). To prevail on a Title VII or UADA discrimination claim, the plaintiff bears the ultimate burden of proving intentional discrimination by the employer. Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008) (Title VII); Sheikh v. Dep't of Pub. Safety, 904 P.2d 1103, 1106 (Utah Ct. App. 1995) (UADA).

Plaintiff does not challenge the district court's determination that she presented no direct evidence of discrimination. Consequently, like the district court, we analyze her discrimination claims under the three-step burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973), which applies when a plaintiff has only circumstantial evidence of discrimination. Adamson, 514 F.3d at 1145. At the first step, a plaintiff must establish "a prima facie case of discrimination." Id. If the plaintiff does so, "the burden of going forward shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions." Id. If the defendant produces such a reason, the burden shifts back to the plaintiff to "show that his [national origin] . . . was a determinative factor" in the employer's decision or to show that the employer's "explanation for its action was merely pretext" for discriminatory intent. Id. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally

8

find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1307 (10th Cir. 2017) (internal quotation marks omitted).[2]

The district court resolved the discrimination claim at the pretext stage. It concluded that Plaintiff had failed to show that Avalon's legitimate, nondiscriminatory reasons for refusing to hire Plaintiff for the RAC position—her communication difficulties, refusal to mentor a nursing student, and qualifications— were mere pretext for discriminating against Plaintiff because she is Chinese. We address each of those reasons in turn to determine whether the district court's analysis of pretext was correct.

Consider first Plaintiff's communication difficulties. In determining whether that reason was pretextual, the district court relied on the well-settled principle that its "role isn't to ask whether the employer's decision was wise, fair or correct" but instead to ask "whether [the employer] honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs." Johnson v. Weld Cty., 594 F.3d 1202, 1211 (10th Cir. 2010) (brackets and internal quotation marks omitted). Accordingly, the district court "'look[ed] at the

---

[2] The burden-shifting framework and prima facie elements developed in Title VII cases also apply to discrimination claims under the UADA. See Darvish v. Labor Comm'n Appeals Bd., 273 P.3d 953, 958–59 (Utah Ct. App. 2012) (explaining that the UADA "was modeled after Title VII" so "the substantial body of federal case law interpreting Title VII is useful" in interpreting the UADA (internal quotation marks omitted)). For convenience, we therefore limit our ensuing discussion to Plaintiff's Title VII claim, the resolution of which controls the outcome of her UADA claim.

9

facts as they appear[ed] to the person making the decision.'" R., Vol. 3 at 802

(quoting EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 483 (10th Cir.

2006)).

Plaintiff challenges these well-established standards, arguing that in a case

where an employee's accent is at issue, an employer has to show more than a

good-faith belief that the employee had communication problems. Instead, Plaintiff

contends, an employer must establish a factual basis for that belief because it would

otherwise be easy to create a "refuge" for national-origin discrimination. Fragante v.

City & Cty. of Honolulu, 888 F.2d 591, 596 (9th Cir. 1989). Fragante and other

cases Plaintiff relies on embrace the view that an employer must not base an

employment decision on accent unless it "interferes materially with job

performance," the employer has made "an *honest* assessment of the oral

communications skills of a candidate for a job when such skills are reasonably

related to job performance," and the employer "establishe[s] a factual basis for

believing that [the candidate] would be hampered in performing [a job] requirement."

Id. at 596-97 (emphasis in original); see also Xieng v. Peoples Nat'l Bank of Wash.,

821 P.2d 520, 524 (Wash. Ct. App. 1991) (following Fragante and rejecting the

good-faith-belief standard in a case where an employee's accent is at issue). We

have suggested the same, albeit in less detail than Fragante. See Carino v. Univ. of

Okla. Bd. of Regents, 750 F.2d 815, 819 (10th Cir. 1984) ("A foreign accent that

does not interfere with a Title VII claimant's ability to perform the duties of the

position he has been denied is not a legitimate justification for adverse employment

decisions."). Plaintiff claims that no factual basis supported Oliver's belief that Plaintiff's accent made her less suitable for the RAC position than the person Avalon hired—Rebecca Holm—because Plaintiff had satisfactorily performed her RN job at Avalon the entire time she had held it.

We may assume, without resolving the matter, that a factual basis is necessary to hold a good-faith belief about accent. Because Plaintiff had worked for Avalon in one capacity (as an RN), and her discrimination claim is based on Avalon's refusal to rehire her for a different position (the RAC), the question is whether Plaintiff's communication problems—including accent-related issues—provided a valid reason for Oliver to believe that Plaintiff was a less desirable candidate than Holm for a position in which the ability to communicate was particularly important.

We conclude that the October 2013 performance appraisal—i.e., the document wherein Oliver noted Plaintiff's accent-related communication difficulties—reflects the factual basis for Oliver's belief. Significantly, that appraisal predated both Plaintiff's voluntary termination of her employment with Avalon and her application for the RAC position. And Plaintiff points to no evidence supporting a reasonable inference that Oliver listed her concerns about Plaintiff's accent-related communication difficulties in the performance appraisal because Oliver intended to later discriminate against Plaintiff based on national origin and rely on the performance appraisal to mask the discrimination. Any such inference—an inference the jury would have to draw to find pretextual the communication-difficulty rationale for Oliver's refusal to hire Plaintiff for the RAC position—would be purely

11

speculative. The timing of the performance valuation thus provides factual support for Oliver's belief that Plaintiff's communication problems, including accent-related issues, made her less suitable for the RAC position than Holm. Hence, the belief was held in good faith at the time Oliver made the RAC decision.

Plaintiff next argues that the district court erred when it concluded that her deposition testimony and sworn declaration that she had no communication problems was self-serving and insufficient to create a material factual dispute under Simms v. Oklahoma ex rel. Department of Mental Health & Substance Abuse Services, 165 F.3d 1321 (10th Cir. 1999), abrogated on other grounds as recognized in Eisenhour v. Weber County, 744 F.3d 1220, 1227 (10th Cir. 2014). In Simms, we stated that "an employee's 'own opinions about his qualifications do not give rise to a material factual dispute.'" 165 F.3d at 1329 (alterations omitted) (quoting Rabinovitz v. Pena, 89 F.3d 482, 487 (7th Cir. 1996)).

The testimony that Plaintiff points to comprises conclusory disagreements with the concerns that Oliver expressed in the performance appraisal. Those conclusory disagreements include the following: (1) Plaintiff "did not use any co-workers" to convey information accurately; rather, Oliver "suggested [she] use co-workers," R., Vol. 3 at 247; (2) "[s]ome patients might not be used to [her] accent at the beginning" but she "tried [her] best to repeat until [they] understood," id. at 250; (3) she had no "communication problems with doctors" or any "others at Avalon," id.; and (4) she did not "have other nurses call a doctor for [her] because [she] did not feel comfortable speaking with the doctor," id. Plaintiff made similar assertions in her

12

declaration, adding that "people who had listening comprehension difficulties"—such as residents with dementia—"might not be used to [her] accent at the beginning," but such people had problems understanding what was said to them regardless of any accent. Id. at 270.

These sorts of conclusory, self-serving assertions, devoid of factual support, do not create a genuine issue of material fact regarding whether Oliver had a good-faith belief that Plaintiff had communication difficulties or that those perceived difficulties made Plaintiff a less desirable candidate for the RAC position. See Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991) ("[T]he nonmovant's affidavits must be based upon personal knowledge and *set forth facts* that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." (emphasis added)). But even acknowledging the conflicts between Oliver's and Plaintiff's opinions, nothing reasonably suggests that Oliver's opinion was motivated by discriminatory animus or that Oliver provided it in order to mask a later, discriminatory refusal to hire Plaintiff for a position Plaintiff had not yet applied for.

Plaintiff further claims that the district court disregarded parts of her performance evaluation that stated she "is fully competent and is satisfactorily performing the job," R., Vol. 1 at 408, and that she "work[s] well independently," id. at 409. This is incorrect. The district court did acknowledge Plaintiff's argument that she had a "satisfactory job evaluation" but explained that it could not rely on the evaluation to find pretext because "the performance evaluation itself . . . is rife with

13

Ms. Oliver's concerns about Ms. Plaintiff's communication difficulties." Id., Vol. 3 at 803–04 (internal quotation marks omitted).

Plaintiff also points to other filings she made in the district court in which she allegedly showed that Oliver's belief was inconsistent with other evidence in the record. As best as we can discern, the evidence identified in those filings consists of the following (but none of it is inconsistent with Oliver's belief that Plaintiff's communication difficulties, particularly her accent, were a problem while she worked as an RN or that they made her a less suitable candidate for the RAC position than Holm):[3]

First, Zu argues that Oliver fabricated a story in order to provide support for Oliver's belief that Zu had communication difficulties. Specifically, Oliver discussed an incident where a resident was transferred to the hospital after complaining of bad headaches. Oliver testified that a CNA reported that Plaintiff's communication difficulties led the CNA to ask a different nurse to assess the resident. But, as Zu notes, the CNA did not work on May 19, 2013—the day the resident was transferred to the hospital—implying that Oliver fabricated this story. Id. at 531. And as Plaintiff further observes, the resident's sister thought Plaintiff had been the only one helpful on May 19 in getting the resident moved to the hospital. Id. at 531–32 (citing

---

[3] In her appellate brief, the only portions of the record Plaintiff cites is her objection to the declarations of Oliver, Griffis, and Kirton, see Supp. R., Vol. 1 at 106–14, and her responses to Avalon's statement of undisputed facts Nos. 16–18, 29, and 32, see R., Vol. 3 at 528–34 and 541–44. See Opening Br. at 19. The evidence we identify is further referenced in those portions of the record.

14

id. at 244–45, Plaintiff's deposition testimony describing the incident, and id. at 442–43, the resident's sister's affidavit).  Plaintiff's account omits, however, that the CNA did work on May 18, the day before the resident was admitted to the hospital, see id. at 32 (CNA's timecard), and a work schedule suggests that Plaintiff worked that day as well, see id. at 46.  Further, the resident's sister reported that the resident had been complaining of a headache for two days before she was admitted and that the nurse did not listen to her.  Id. at 443.  And even more, a schedule suggests that Plaintiff worked on May 18.  See id. at 46.  Given all this, we cannot say that the fact that the CNA Oliver identified at her deposition was not scheduled to work on May 19 leads to a reasonable inference that Oliver fabricated a story that a CNA reported that Plaintiff's accent caused some problems regarding that resident, or that Oliver discriminated against Plaintiff on the basis of national origin when she declined to hire her for the RAC position.

Second, Plaintiff noted Oliver's testimony that on other occasions, a different nurse had "covered for Plaintiff communicating."  Id. at 553.  Plaintiff denied that testimony by noting that she had only worked with that nurse on four days during Plaintiff's nearly eighteen-month tenure at Avalon, and therefore Plaintiff "could not [have] cause[d] considerable frustration and tension even assuming [the nurse] had covered Plaintiff for communication each . . . of the four days."  Id.  This does not suggest pretext; a complaint certainly could arise from a coworker with whom an employee had worked only four days in a year-and-a-half.

15

Third, Plaintiff noted Oliver's testimony that Plaintiff was reassigned on at least two occasions because residents could not understand her or she could not understand them. Id. at 534 (citing id. at 438). Plaintiff also denied those allegations in her declaration by stating, "At Avalon, what I was involved in reassignment of residents was only for balancing workload of nurses there." Id. at 270. This conclusory, self-serving denial is insufficient to create a genuine issue of material fact. Hall, 935 F.2d at 1111. But regardless, nothing is inconsistent between reassigning Plaintiff for communications-related reasons, which Oliver believed caused an increase in the workload of other nurses, and Plaintiff's contention that she was reassigned to balance the nurses' workload.

Fourth, Plaintiff testified that she did "not know what [Oliver] meant" when Oliver wrote, in the performance appraisal, that Plaintiff should "'communicate with [the] CNAs in a respectful manner.'" R., Vol. 3 at 248. Plaintiff has not explained, and we fail to see, how her lack of understanding suggests pretext.

Fifth, Plaintiff attempted to dispute Avalon's assertion that Oliver and Griffis "perceived [Plaintiff] as an average employee who sometimes struggled to meet performance expectation[s] and certainly did not exceed them" by pointing to statements in her performance appraisal that she performed her RN job satisfactorily. Id. at 542–43. But the performance appraisal, as detailed above, speaks for itself: Oliver thought that Plaintiff's performance overall was satisfactory but also noted problem areas. We see no inconsistency here, let alone any that suggests pretext in the RAC decision. This court's "role is to prevent unlawful hiring practices, not to

16

act as a super personnel department that second guesses employers' business judgments." Simms, 165 F.3d at 1330 (internal quotation marks omitted). And none of the foregoing arguments suggests that the RAC decision involved an unlawful hiring practice.

Plaintiff's final point regarding communication difficulties is based on Oliver's comment that she would give Plaintiff a good reference, which Oliver sent in a text-message response to Plaintiff's text message notifying Oliver that she had applied for the RAC position and one RN position. Plaintiff believes this comment indicates that Oliver believed Plaintiff was competent for the RAC position, and she questions why Oliver promised to give her a good reference at the same time she rejected Plaintiff's applications. In her text message, however, Oliver stated that the RN position had already been filled but not closed out, she had no current needs, and the RAC position had been filled with someone who had more experience with MDSs. Hence, there is no inconsistency between promising a good reference for future jobs and rejecting Plaintiff's RN application because the position had already been filled. And while it is unclear from the text message whether Oliver thought Plaintiff was competent for the RAC position, that is not the relevant inquiry. The relevant inquiry is whether there is a triable issue that Oliver's opinion that Holm was the better choice for the RAC position was a pretext for national-origin discrimination. Plaintiff has failed to establish a triable issue of pretext regarding Oliver's opinion that her communication difficulties rendered Plaintiff less desirable for the RAC position than Holm.

17

Next consider Plaintiff's refusal to mentor a nursing student. As the district court observed, Plaintiff admitted as much and claimed that her refusal occurred in July 2012. Although the parties dispute when that occurred and whether Plaintiff had refused to mentor nursing students on other occasions, the district court determined that those disputes were immaterial. Its reasoning was simple: the single, admitted incident supported the conclusion that Oliver had believed in good faith that the refusal was a factor in deciding not to hire Plaintiff for the RAC position. The district court, for instance, noted Plaintiff's argument that she had been promoted from her part-time RN position to a full-time RN position *after* the July 2012 incident; nonetheless, the district court reasoned that fact would be germane only to the genuineness of Oliver's beliefs when making decisions about an RN position because the duties of that position included mentoring. The district court thus considered the RAC hiring decision to be different because that position was supervisory. Therefore, the district court concluded, Oliver's belief about the refusal to mentor a nursing student was a legitimate factor in the RAC decision, and none of the evidence suggested pretext.[4]

---

[4] Plaintiff takes issue with the district court's determination that she had not presented enough evidence for the court to conclude that Avalon's concern about Plaintiff's refusal to mentor "was not a legitimate, non-discriminatory reason for failing to hire her for the RAC position." R., Vol. 3 at 807. Plaintiff claims this shows the court did not conduct a pretext analysis. But this is just a matter of semantics. The district court's entire analysis of the mentoring issue concerned pretext, and the manner in which it stated its conclusion was no more than another way of stating that Plaintiff had not established pretext.

On appeal, Plaintiff claims that the district court failed to discuss some of her arguments and instead acted as an advocate for Avalon. She points out that Kirton did not mention the refusal to mentor when he responded to Plaintiff's contention that she had been discriminated against in the RAC hiring decision. To be sure, inconsistent reasons for an employment decision can suggest pretext. Dewitt, 845 F.3d at 1307. But Oliver testified that she could not recall whether she told Kirton that the mentoring issue was among the reasons she decided not to hire Plaintiff for the RAC position. R., Vol. 3 at 394. Accordingly, Kirton's failure to mention it to Plaintiff does not plausibly suggest pretext, particularly in light of the fact that Avalon included the mentoring issue in its formal response to Plaintiff's charge of discrimination. Id., Vol. 1 at 279.

Plaintiff also contends that her promotion from part-time to full-time after the July 2012 refusal to mentor a nursing student creates a genuine dispute of material fact as to whether Oliver believed that refusal was a legitimate reason for not hiring her for the RAC position. We disagree. As the district court recognized, the RN and RAC positions required different skill sets. So although any number of reasons might have caused Oliver to promote Plaintiff to a full-time RN position despite her refusal to mentor a nursing student, nothing suggests that Oliver did not genuinely believe that the refusal to mentor counted against Plaintiff in the RAC hiring decision. We are not at liberty to second-guess Oliver's business judgment. Simms, 165 F.3d at 1330.

19

Finally, Plaintiff argues that Avalon's Human Resources Manager, Lilia Benitez, was the RAC decision-maker, not Oliver. She points to the facts that (1) the RAC position reported to the Resident Assessment Director, whereas Oliver was the Director of Nursing; and (2) Benitez was listed as the hiring manager on the RAC job posting and sent Plaintiff an email stating Avalon had "determined to move forward with candidates [for the RAC position] who more closely meet[] all our requirements." R., Vol. 1 at 435. Further, the magistrate judge thought that "Benitez played a role in the hiring process" with regard to one of the RN positions, id., Vol. 3 at 734, but otherwise considered Oliver as the decision-maker. For its part, the district court concluded that Benitez had, at most, an administrative role in hiring decisions, not a substantive one.

We agree with the district court. Nothing in the record contradicts Benitez's testimony that as hiring manager, she was "able to manage [the] system," id. at 470, and that she "post[s] the position[s]," forwards email and candidate information to the employee looking to hire someone, and does not "even . . . read the resume," id. at 461–62.

Plaintiff next takes issue with the district court's determination that she had "not shown an overwhelming disparity in qualification between her and [Holm]." Id. at 808 (citing Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1309 (10th Cir. 2005) (per curiam), which held that "[t]o show pretext, the disparity in qualifications must be overwhelming" (internal quotation marks omitted)). Objectively, Plaintiff had a superior education—a bachelor's degree in nursing and a recently-acquired master's

20

degree in nursing administration; Holm had only an associate's degree. But Avalon never claimed it had hired Holm because she had a better education. Instead, in its position statement before the Utah Antidiscrimination and Labor Division, Avalon asserted that Holm's "experience with admissions (she had been an Admissions Coordinator), the fact that she had worked on the Medicare hall for her previous employer[,] and the strong communication and inter-personal skills she demonstrated during her interview" led to her hire. Id., Vol. 1 at 279. And while Plaintiff's twenty years of nursing experience far outpaced Holm's three years of nursing experience, the RAC position was a managerial position that required strong communication skills. See id., Vol. 3 at 67 (describing the RAC as "a key financial and clinical member of the management team," "a good communicator," and "well-versed in inter-personal communications"). As discussed, Oliver had legitimate concerns about Plaintiff's ability to communicate, whereas no evidence suggests that Holm had a similar problem. On balance, we cannot say that Plaintiff's relevant qualifications so overwhelmed Holm's as to raise a reasonable inference of pretext.

Plaintiff faults the district court for relying on Oliver's testimony that Holm had experience on a Medicare hall, which was relevant to the RAC position, but Plaintiff had been assigned to long-term care and had performed relatively few admissions. Plaintiff says this was error because in its summary judgment motion, Avalon did not rely on these facts, so Plaintiff never had an opportunity to dispute them. She now claims that she had worked some shifts in Avalon's Medicare hall, and she points to the statement in her performance appraisal that her "admissions are

21

thorough." Id., Vol. 1 at 409. But even if Plaintiff had experience on the Medicare hall, that experience at most shows that Plaintiff and Holm were perhaps on par in that respect, not that there was an "overwhelming" disparity between their qualifications. Jaramillo, 427 F.3d at 1309. And Oliver's assessment that the admissions Plaintiff had performed as an RN at Avalon were "thorough" is not inconsistent with her opinion that Plaintiff had performed fewer admissions than Holm. We therefore cannot draw any reasonable inference of pretext from Oliver's opinion about the relative quantity of admissions between Plaintiff and Holm.

Finally, Plaintiff suggests that Holm's unprofessionalism shows that she (Plaintiff) was more qualified. Specifically, on December 4, 2013, about a month prior to the RAC decision, Holm was involved in some unprofessional conduct regarding patient care. On November 6, 2014, Holm entered into a stipulated order with Utah's Division of Occupational and Professional Licensing documenting that conduct and placing her on probation. But as the district court observed, nothing in the record showed that anyone at Avalon was aware of the unprofessional conduct when the RAC decision was made in January 2014. Plaintiff argues that because Avalon did not dispute that the unprofessional conduct had occurred, the mere fact that it occurred before the RAC decision was made is enough to create a genuine issue of material fact whether Plaintiff was clearly the more qualified applicant. But Plaintiff still points to no evidence that Avalon knew about the conduct when it decided to hire Holm. And the pretext inquiry requires looking at the facts from the

22

decision-maker's perspective at the time the decision is made.  BCI Coca-Cola

Bottling Co., 450 F.3d at 483.[5]

B.

Both Title VII and the UADA prohibit retaliating against an employee who

files a charge of national-origin discrimination.  See 42 U.S.C. § 2000e-3(a); Utah

Code Ann. § 34A-5-102(1)(y) (defining retaliation to include taking adverse action

for filing discrimination charges); id. § 34A-5-106(1)(a)(i) (prohibiting retaliation).

Plaintiff's retaliation claims were based on allegations that Avalon refused to give

her a job reference or gave her an unfavorable job reference.  As with a

discrimination claim, we apply the McDonnell Douglas burden-shifting framework to

Title VII and UADA retaliation claims that are based on indirect evidence.  See Argo

v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006)

(Title VII claim); Viktron/Lika v. Labor Comm'n, 38 P.3d 993, 995 (Utah Ct. App.

2001) (UADA).  To establish a prima facie case of retaliation, Plaintiff had to show

that (1) she "engaged in protected opposition to discrimination"; (2) Avalon took

action against her that a reasonable employee would have found "materially

adverse"; and (3) "a causal connection existed between the protected activity and the

---

[5] Plaintiff also quotes from the magistrate judge's decision: "The Defendants' claim that [Plaintiff's] delay in renewing her work authorization caused them more concern tha[n] [Holm's] error in patient care could ring hollow to a reasonable jury." Aplt. Opening Br. at 31 (quoting R., Vol. 3 at 748–49).  Defendants deny having ever made such a claim, Plaintiff has not directed us to it, and we cannot find it in the record.  We therefore afford this statement no consideration in the pretext analysis.

23

materially adverse action." Argo, 452 F.3d at 1202; see also Viktron/Lika, 38 P.3d at 995 (setting forth materially identical prima-facie-case factors).[6]

The district court ruled that Plaintiff had failed to establish the second prong of her prima facie case—i.e., that Avalon had taken action against Plaintiff that a reasonable employee would have found materially adverse. The key evidence Plaintiff relied on was a sworn declaration from her husband, Joey Fuller. Fuller stated that in September 2014, he and Plaintiff spoke by telephone with a recruiter Plaintiff was working with named Joy Wolf. Wolf allegedly told Fuller and Plaintiff that he had contacted Griffis for a reference, but Griffis would provide only Plaintiff's date of employment. When Wolf "tried asking [for] more information, [Griffis][7] said she could not tell because of a pending discriminatory charge filed by Plaintiff against Avalon." R., Vol. 3 at 473. Wolf explained to Fuller and Plaintiff that "because of [the] unsatisfactory job reference, he could not offer Plaintiff a job." Id.[8]

The magistrate judge ruled that this evidence, combined with Oliver's text-message promise that she would give Plaintiff a good reference, satisfied the second element of Plaintiff's prima facie case. Avalon objected that Fuller's

---

[6] Because the analysis of retaliation claims under Title VII and the UADA is identical, we limit our ensuing discussion to Plaintiff's Title VII retaliation claim.

[7] Fuller's declaration refers to Amy Hill, which was Amy Griffis's name at the time.

[8] This incident is apparently the unfavorable job reference that Plaintiff complained about.

declaration contained inadmissible hearsay. See Thomas v. Int'l Bus. Machines, 48 F.3d 478, 485 (10th Cir. 1995) (explaining that "hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment"). The district court agreed and, consequently, ruled that Plaintiff failed to establish her prima facie case.

1.

Plaintiff raises several arguments regarding Fuller's declaration, but she properly preserves only one for appellate review. We generally decline to consider arguments not presented in the district court at the appropriate time unless they involve subject matter jurisdiction or sovereign immunity. See Impact Energy Res., LLC v. Salazar, 693 F.3d 1239, 1246 n.3 (10th Cir. 2012) (explaining that failing to raise an issue at the "appropriate time" in the district court waives appellate review); Daigle v. Shell Oil Co., 972 F.2d 1527, 1539 (10th Cir. 1992) ("As a general rule we refuse to consider arguments raised for the first time on appeal unless sovereign immunity or jurisdiction is in question."). The only argument about the admissibility of Fuller's declaration that Plaintiff raised in the district court was in her response to Avalon's objections to the magistrate judge's report and recommendation.[9] And that

---

[9] Plaintiff argues that Avalon accepted Fuller's declaration or waived any hearsay objection to it because Avalon did not dispute its content or substance until it objected to the magistrate judge's report and recommendation. See Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."). This overlooks the fact that Avalon raised the hearsay issue in its reply in support of its motion for summary judgment and accompanying appendix. See Supp. R., Vol. 1 at 33, 96.

argument had only two parts: (1) Fuller's declaration could be considered at summary judgment because it could be replaced by his testimony at trial; and (2) the residual exception to the hearsay rule, Federal Rule of Evidence 807, applied. R., Vol. 3 at 797.

We agree that the district court could properly consider Fuller's declaration itself at summary judgment because Fuller could testify about its contents. Even so, that does not overcome the problem that what Griffis allegedly said to Wolf—and what Wolf allegedly said to Fuller—are also hearsay. See Johnson, 594 F.3d at 1210 (explaining that "although evidence presented in the form of an affidavit at summary judgment can be 'converted' in form into live testimony at trial, the content or substance of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration"). In a case such as this where multiple statements amount to hearsay, each step in the hearsay chain must overcome admissibility problems. See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

On appeal, Plaintiff raises not only the residual exception but also several other reasons why the statements of Griffis and Wolf are not inadmissible hearsay.[10]

---

[10] Those other arguments are that she is not offering Griffis's statement "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2); Griffis's statement is admissible as the non-hearsay admission of a party opponent under Rule 801(d)(2); and Wolf's statement falls within Rule 803(6)'s exception to the rule against hearsay for certain business records.

But she has not argued for plain-error review of those arguments she failed to present to the district court, so we confine our analysis to the residual exception. See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").

Plaintiff argues that Wolf's statement falls within Rule 807's residual exception, but she has not shown at least two of the four requirements that exception requires. The first of the rule's requirements Plaintiff has not established is that Wolf's statement about what Griffis told him must have "equivalent circumstantial guarantees of trustworthiness" as the exceptions specifically set out in Rules 803 and 804. Fed. R. Evid. 807(a)(1). Plaintiff claims it did because Wolf was "an agent of [Plaintiff's] potential employer." Aplt. Opening Br. at 35. We fail to see how that fact imbues Wolf's alleged statement with any guaranty of trustworthiness akin to that found in any of the exceptions in Rules 803 or 804. For example, Wolf's statement "was not made under oath or subject to cross-examination," and Plaintiff has not "offered any evidence as to [Wolf's] character for truthfulness." Burton v. Kohn Law Firm, S.C., 934 F.3d 572, 583 (7th Cir. 2019).

The second of Rule 807's requirements that Plaintiff cannot satisfy is that Wolf's statement "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3). Plaintiff has not explained why she could not get Wolf to provide a sworn statement about what Griffis allegedly told him rather than rely on her

27

husband's testimony about what Wolf said. See Burton, 2019 WL 3757571, at \*6 (concluding that "[t]hrough 'reasonable efforts," plaintiff "could have obtained the sworn deposition or in-court testimony" of the alleged speaker, which "would have been equally as probative, if not more probative" than the speaker's hearsay statement (quoting Fed. R. Evid. 807(a)(3)). Plaintiff instead argues that Fuller's declaration is the most probative evidence she could muster because she is unlikely to get an admission directly from Griffis. That, however, overlooks the need for the residual exception to apply to what Wolf purportedly told Fuller.

2.

Plaintiff also claims that the district court failed to consider Avalon's failure to provide a job reference (as compared with the unfavorable reference Griffis allegedly provided to Wolf). Specifically, she contrasts Oliver's initial text-message offer to provide a good reference despite the fact that Plaintiff had not signed a release form—as company policy required—with Avalon's alleged refusal later on to provide a reference even though Plaintiff requested one by email. Aplt. Opening Br. at 39–40. She claims that this is evidence that Avalon failed to follow its usual practice, which can support an inference of retaliation. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000) (explaining that a plaintiff can show pretext with evidence that an employer "acted contrary to a written company policy prescribing the action to be taken by the [employer] under the circumstances" or "contrary to an unwritten policy or contrary to company practice when making the adverse employment decision").

28

But as Avalon points out, nothing suggests that Oliver or anyone else at Avalon failed to follow Avalon's "usual practice." That practice, as spelled out in Avalon's Employee Handbook, provides that "Avalon does not respond to verbal requests for references." R., Vol. 3 at 143. If an employee wants a reference, she "must complete a signed release form"; without one, "Avalon will only provide your job title and dates of employment to a prospective employer. With a written and signed authorization, we will provide salary information to a financial institution on your behalf." Id. As best we understand her argument, Plaintiff points to Oliver's promise to give her (Plaintiff) a reference as evidence that Avalon deviated from its policy. But Oliver never provided a reference; rather, she apparently adhered to the policy. Oliver's promise, therefore, does not plausibly suggest that Avalon sometimes deviates from its written policy but declined to do so here in order to retaliate against Plaintiff.

## IV.

For the reasons above, we AFFIRM the district court's judgment.

Entered for the Court

Joel M. Carson III
Circuit Judge

29